**SO ORDERED.**

**SIGNED this 2nd day of February, 2012.**



Dale L. Somers
United States Bankruptcy Judge

_____

**For on-line use and print publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

In Re:

BROOKE CORPORATION, et al.,

                 Debtors.

CHRISTOPHER J. REDMOND,
Chapter 7 Trustee of Brooke
Corporation, Brooke Capital
Corporation, and Brooke Investments,
Inc.,

          Plaintiff,

v.

KUTAK ROCK, LLP, et al.,

          Defendants.

CASE NO. 08-22786
(jointly administered)
CHAPTER 7

ADV. NO. 10-6246

**MEMORANDUM OPINION AND ORDER**
**FINDING THE AMENDED COMPLAINT FAILS TO STATE CLAIMS ON**
**WHICH RELIEF CAN BE GRANTED AGAINST UNDERWRITERS AND**

**GRANTING THE TRUSTEE LEAVE TO FILE AN AMENDED COMPLAINT**

The Court has under advisement the Motion to Dismiss All Claims Against the Underwriters (Motion),[1] filed by defendants Sandler O'Neill & Partners, L.P., Macquarie Holdings (USA) Inc.,[2] and Oppenheimer & Co., Inc. (collectively, "Underwriters").[3] The Amended Complaint,[4] filed by Plaintiff Christopher J. Redmond,[5] Chapter 7 Trustee for Debtors Brooke Corporation, Brooke Capital Corporation, and Brooke Investments, Inc., alleges common law causes of action for negligence and deepening insolvency against Underwriters arising out of Brooke Corporation's (Brooke Corp.'s) retention of Underwriters in 2005 in conjunction with a follow-on public offering of Brooke Corp. common stock. Underwriters contend that the Amended Complaint fails to state a claim for negligence and that deepening insolvency is not a valid cause of action.

The Court holds the Amended Complaint fails to state claims on which relief may be granted against Underwriters because: (1) The negligence claim fails to identify the duty alleged to have been breached; and (2) the Kansas Supreme Court would not recognize the separate tort of deepening insolvency. But the Trustee is granted leave to

---

[1] Dkt. 102.

[2] Macquarie Holdings is alleged in the Amended Complaint to be the successor to Fox-Pitt Kelton Cochran Caronia Waller LLC. Dkt. 67 at ¶ 18.

[3] Underwriters appear by James L. Moeller, Brian T. Fenimore, James Moloney, and Clay Britton of Lathrop & Gage LLP.

[4] Dkt. 67.

[5] The Trustee appears by Benjamin F. Mann, John J. Cruciani, and Michael D. Fielding of Husch Blackwell LLP.

file an amended complaint restating his negligence claim.

**APPLICABLE STANDARD.**

Underwriters move to dismiss the claims against them under Bankruptcy Rule 7012(b), which incorporates Civil Rule 12(b)(6), and provides for dismissal if the complaint fails to state a claim upon which relief can be granted. The Motion tests the legal sufficiency of the allegations — whether they are "a short and plain statement of the claim showing that the pleader is entitled to relief," as required by Bankruptcy Rule 7008(a), which incorporates Civil Rule 8(a)(2). Satisfaction of this standard gives "'the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"[6] Further, "to withstand a motion to dismiss, a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'"[7] In this case, the principle question is whether the claims allege legal theories which are cognizable under applicable law.[8]

**ALLEGATIONS OF THE AMENDED COMPLAINT.**

The Amended Complaint seeks redress from multiple parties for the economic collapse of Debtors. Defendant Kutak Rock, LLP, was retained as Debtors' legal counsel

---

[6] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (*quoting Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

[7] *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (*quoting Twombly*, 550 U.S. at 570).

[8] 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure, Civil*, § 1357 at 456-62 (3rd ed. 2004) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists.").

3

as early as 2004 to provide a wide range of legal services. Legal malpractice and other claims are alleged against the law firm. Debtors' former officers and directors are sued for breach of fiduciary duty and other claims. Negligence and deepening insolvency claims are alleged against Underwriters. This memorandum is concerned only with the motion to dismiss the claims against Underwriters.

The Amended Complaint alleges the following background facts. Debtor Brooke Corp., a holding company listed on the NASDAQ Global Market, was a Kansas corporation, headquartered in Kansas. Debtor Brooke Capital was also a Kansas corporation headquartered in Kansas, and was a publicly-traded company that was listed on the American Stock Exchange. Brooke Capital was an insurance agency and finance company that distributed services through a network of franchise and company-owned businesses. Brooke Capital owns 100% of the stock of Debtor Brooke Investments. Brooke Corp. and Brooke Capital are referred to collectively in the Amended Complaint and in this opinion as "Brooke."

Debtors, and approximately thirty other affiliated companies, were engaged primarily in the business of selling insurance and related services through franchisees. Each franchisee agreed to pay Brooke franchise fees, including an initial franchise fee and buyer assistance fees, and to share a percentage of its sales commissions with Brooke. In return, Brooke agreed to provide ongoing services to each franchisee. The costs of acquisition of agencies and franchises were typically financed through Brooke's lending subsidiary. Between 2004 and 2007, Brooke experienced tremendous growth in the

4

number of franchisees it had. Brooke's payroll and other operating expenses increased

very quickly. In many instances, the commissions a franchisee earned were not adequate

to cover the franchisee's loan payments or other expenses owed to Brooke. Brooke

absorbed the shortfalls and advanced funds to the franchisees to cover them.

The Trustee alleges that Brooke's business model was unsustainable. According

to the Trustee, Debtors were continuously insolvent from at least 2003 through their

respective bankruptcy filing dates in 2008, but Brooke's improper accounting practices

resulted in a false appearance of solvency.

In January 2005, in order to raise additional capital, Brooke's management began

meeting with various underwriters to explore the possibility of a follow-on public offering

of Brooke common stock.[9] Defendants Underwriters were retained. The allegations

regarding Underwriters' activities include the following.

 Underwriters undertook due diligence, including a review of Brooke's franchise

relationships and the background, history, and qualifications of  Brooke's auditors.

Meetings with Brooke's management, auditors, actuaries, and consultants were held in

February, March, and April 2005, as Underwriters participated in drafting a 2005 S-1,

which was filed with the Securities and Exchange Commission (SEC) on April 21, 2005.

---

[9] Dkt. 67 at ¶ 196. The Amended Complaint generally refers to "Brooke" (defined to be collectively Brooke Corp. and Brooke Capital) as to the follow-on offering, although the August 9, 2005, Underwriting Agreement (Dkt. 103-1) is between Underwriters and Brooke Corp., and Brooke Corp. common stock is the only stock alleged to have been issued. Since Underwriters have not raised the apparent confusion of parties, the Court likewise will use "Brooke" when it is not apparent whether both Brooke Corp. and Brooke Capital or only one of them was involved.

Underwriters assisted Brooke's management in responding to SEC comments regarding Brooke's 2005 S-1.

On August 9, 2005, the SEC declared the 2005 S-1 effective, and Brooke announced the pricing of its follow-on offering of 2,500,000 shares of Brooke common stock at $11.50 per share. On the same date, Underwriters entered into an Underwriting Agreement (Agreement) with Brooke Corp. whereby they agreed to purchase the Brooke Corp. shares. On August 15, 2005, Brooke announced the completion of its follow-on offering of 2,500,00 shares. On August 22, 2005, Underwriters exercised their right to purchase their over-allotment and purchased an additional 375,000 shares. The gross proceeds of the offering were $28,750,000.

The Trustee alleges that "Underwriters were experts in accounting and financial matters and had superior knowledge to Brooke and Brooke Corp.'s Board of Directors with respect to such matters."[10] It is further alleged that the due diligence conducted by Underwriters "revealed or should have revealed numerous areas of concern regarding Brooke and its planned offering of Brooke common stock,"[11] and Underwriters "should have applied heightened scrutiny with respect to the portions of the 2005 S-1 that addressed these issues or that should have addressed these issues."[12] According to the Trustee, the 2005 S-1, which Underwriters "helped draft and approved, does not . . .

[10] *Id*. at ¶ 205.

[11] *Id*. at ¶ 214.

[12] *Id*. at ¶ 218.

6

identify all of the risks and concerns that the Underwriters had earlier identified for themselves, presenting a misleading picture of Brooke."[13]

Based upon the factual allegations which are summarized above, Count XIV of the Amended Complaint alleges a negligence claim against Underwriters as follows:

> 373. At the request of the Board of Directors of Brooke Corp., Sandler O'Neill, Fox-Pitt Kelton, and Oppenheimer served as underwriters for Brooke's follow-on offering of 2,500,000 shares of common stock.
>
> 374. In connection with their underwriting, the Underwriters conducted certain due diligence of Brooke and its planned offering.
>
> 375. The Underwriters performed this due diligence negligently in failing to discover Brooke's improper financial accounting practices and its insolvency.
>
> 376. Alternatively, to the extent the Underwriters did discover Brooke's improper financial accounting practices and its insolvency, the Underwriters were negligent in failing to bring Brooke's improper financial accounting practices and its insolvency to the attention of Brooke Corp.'s Board of Directors and in failing to ensure that the 2005 S-1 accurately addressed these issues so as not to mislead investors.
>
> 377. By presenting a misleading picture of Brooke's finances and failing to disclose that Brooke was insolvent at the time of the follow-on offering, the 2005 S-1 allowed Brooke to raise over $27 million, thereby damaging Brooke by prolonging Brooke's corporate life and allowing it to incur additional debts and waste the capital raised through the follow-on offering.
>
> 378. Between 2004 and 2008, and because both Brooke and

---

[13] *Id.* at ¶ 220.

its lenders believed that Brooke was solvent, Brooke incurred additional debt, and went from a company that was on the brink of solvency to a company that has over $450M in claims against it and its investors.

379. The unlawful prolongation of Brooke's corporate life has caused irreparable damage to Brooke and to its general unsecured creditors in an amount in excess of millions of dollars.[14]

The Amended Complaint also alleges a cause of action for deepening insolvency in Count XIII. After alleging the same first two paragraphs as are alleged in the negligence claim, Count XIII alleges as follows:

365. The due diligence conducted by the Underwriters revealed or should have revealed numerous "red flags" regarding Brooke, including but not limited to areas of concern regarding Brooke, its financial accounting, and its insolvency.

366. Having been aware of the various "red flags" they discovered or should have discovered during their due diligence, the Underwriters should have applied heightened scrutiny with respect to the portions of the 2005 S-1 that addressed these issues or that should have addressed these issues.

367. The 2005 S-1, which the Underwriters were retained to help draft and approve, however, does not identify all of the risks and concerns that the Underwriters had earlier identified for themselves and fails to disclose Brooke's improper financial accounting practices and insolvency.

368. By presenting a misleading picture of Brooke and failing to disclose that Brooke was insolvent at the time of the follow-on offering, the 2005 S-1 allowed Brooke to raise over $27 million.

---

[14] *Id*. at ¶¶ 373-379.

8

369.  This allowed Brooke to continue to operate beyond the point when it should have liquidated, thereby damaging Brooke by prolonging Brooke's corporate life and allowing it to incur additional debts and to waste the capital raised through the offering.

370.  Between 2004 and 2008, and because both Brooke and its lenders believed that Brooke was solvent, Brooke took on additional debt, and went from a company that was on the brink of solvency to a company that has over $450M in claims against it and its affiliates.

371.  The unlawful prolongation of Brooke's corporate life has caused irreparable damage to Brooke and to its general unsecured creditors in an amount in excess of millions of dollars.[15]

## UNDERWRITERS' MOTION TO DISMISS

In their memorandum in support of their Motion, Underwriters argue that:  (1) The negligence claim fails under New York law (which is the applicable law as stated in the Agreement) or, in the alternative, the negligence claim fails under Kansas law; (2) deepening insolvency is neither a valid cause of action nor a rational theory of corporate harm; (3) the statute of limitations bars the Trustee's claims; and (4) *in pari delicto* bars the Trustee's claims because Brooke's management is primarily responsible for any harm arising out of the 2005 public offering.[16]

The Trustee responds that the Agreement is not relevant and that:  (1) Kansas law supplies the applicable law, and the negligence claim is timely under the Kansas statute of

---

[15] *Id.* at ¶¶ 365-371.

[16] Dkt. 103.

9

limitations; (2) the Trustee has properly alleged a negligence claim under Kansas law; (3) deepening insolvency is a recognized, independent cause of action; and (4) either *in pari delicto* does not apply to the Trustee or there are facts in issue regarding this defense.[17]

## ANALYSIS AND CONCLUSIONS OF LAW.

### A.  Kansas law controls whether the Amended Complaint states tort claims on which relief can be granted.

Underwriters argue that their relationship with Brooke is governed by the Agreement,[18] and the choice of law provision of the Agreement requires that the Motion be decided under New York law.  The relevant part of that provision reads:

> THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES OF SAID STATE OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.[19]

The Trustee alleges Kansas law applies to the tort claims.  The Court therefore begins its analysis by deciding what substantive law controls the tort claims, whether it is New York law, as stated in the Agreement, or Kansas law, the law of the forum state.  For the reasons stated below, the Court holds that Kansas law applies.

---

[17] Dkt. 113.

[18] Although a copy of the Agreement is not attached to the Amended Complaint, it is referred to in ¶ 232.  Underwriters submitted a copy as an attachment to the Motion.  It may be considered by the Court when ruling on the Motion.  *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[19] Dkt. 103-1 at 29, ¶ 16.

10

The Amended Complaint alleges jurisdiction under 28 U.S.C. §§ 157 and 1334. When proceeding "pursuant to the grant of jurisdiction under 28 U.S.C. § 1334 covering civil actions related to bankruptcy proceedings, federal courts 'employ the forum state's choice of law doctrines where the underlying rights and obligations are defined by state law.'"[20] It is well established in Kansas that "[w]here the parties to a contract have entered an agreement that incorporates a choice of law provision, Kansas courts generally effectuate the law chosen by the parties to control the agreement."[21] The question is therefore whether the parties to the Agreement intended the choice of law section to control the tort claims.

This question is answered by construing the Agreement. It obligates Underwriters to purchase 2,500,000 shares of Brooke Corp. common stock, subject to the terms and conditions of the Agreement. There is no question that Underwriters purchased the stock. The Agreement does not impose on Underwriters the duties of making a due diligence investigation, preparing or approving the 2005 S-1, or advising Brooke and its management, the matters at issue in this litigation.

Rather, under the Agreement, *Brooke warranted to Underwriters* that submissions to the SEC complied with applicable law and did not contain any untrue statements of material fact. Underwriters did not make a similar warranty to Brooke. *Brooke also*

---

[20] *Mukamal v. Bakes*, 383 B.R. 798, 815 (S.D. Fla. 2007) (*quoting Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 2002 WL 362794, *5 (S.D.N.Y. Mar. 6, 2002)).

[21] *Brenner v. Oppenheimer & Co., Inc.,* 273 Kan. 525, 539, 44 P.3d 364, 375 (2002).

11

*warranted to Underwriters* the sufficiency of its accounting controls and that the

"financial statements . . . filed with the Commission as part of the Registration Statement

and included in the Prospectus . . . present fairly the consolidated financial position of the

Company and its subsidiaries" and had, unless otherwise noted, been prepared in

conformity with generally accepted accounting principles.[22]  *Brooke agreed to indemnify*

*Underwriters* for losses, claims, damages, or liabilities arising out of untrue statements of

material fact or omissions in SEC filings.[23]  The parties agreed that the only information

Underwriters provided to Brooke specifically for inclusion in SEC filings was "the

concession and reallowance figures and the text under the caption 'Stabilization'

appearing in the Prospectus in the section entitled 'Underwriting.'"[24]  Liability arising

from such information is *excluded* from Brooke's obligation to indemnify Underwriters.

And *Underwriters agreed to indemnify Brooke* only for liability arising from such

information.[25]

In the Agreement, Brooke agrees with Underwriters that "in connection with the

sale of the Shares, . . . no fiduciary or agency relationship between Company and any

Underwriter has been created in respect of any of the transactions contemplated by this

---

[22] Dkt. 103-1 at 3, ¶ 1(a)(iv).

[23] *Id*. at 24, ¶ 8(a).

[24] *Id*.

[25] *Id*. at 24-25, ¶ 8(a) and (b).

Agreement."[26]  In a broadly worded paragraph, Brooke "waive[d], to the fullest extent permitted by law, any claims it may have against any Underwriter for breach of fiduciary duty or alleged breach of fiduciary duty."[27]  The Agreement does not contain an integration clause stating that it addresses the complete relationship between the parties.

The conduct alleged by the Trustee as the basis for tort liability does not include matters covered by the Agreement.  The Agreement is dated August 9, 2005, which is the date the S-1 was accepted by the SEC.  The actions which are the focus of the Amended Complaint are the preparation of the S-1, which occurred in February, March, and April 2005, before the date of the Agreement.  At oral argument, counsel for the parties agreed that assistance in the preparation of the S-1 was a service provided by Underwriters, but this service is not addressed by the Agreement.  Although the possibility of a fiduciary duty between Underwriters and Brooke Corp. is addressed by the Agreement, the Amended Complaint does not allege a breach of fiduciary duty claim.  There is no contention that the tort claims are liabilities covered by the parties' respective indemnification obligations.

The choice of law provision in the Agreement is narrow, stating "this agreement shall be governed by, and construed in accordance with, the laws of the State of New York."[28]  The Amended Complaint alleges two tort claims, negligence and deepening

---

[26] *Id*. at 28-29, ¶ 12(a).

[27] *Id*. at 29, ¶ 12(c).

[28] *Id*. at 29, ¶16.

insolvency, neither of which involve enforcement or construction of the Agreement. The parties' intent as expressed in the Agreement provides no basis to conclude that they either contemplated the tort liability alleged or agreed that New York law would be applicable to such claims. The Court finds the Agreement's choice of law provision is not applicable to the tort claims.

As to tort actions, Kansas follows the rule of *lex loci delicti*, under which the law of the state where the injury occurred is the law that applies.[29] In this case, the Trustee alleges tort causes of action injuring Brooke, corporations which are organized and headquartered in Kansas. The law of Kansas therefore is applicable.

### B. Under Kansas law, the fact of the contractual relationship between Brooke Corp. and Underwriters does not preclude Underwriters' liability for an independent tort.

Underwriters rely in part upon the well-established rule of Kansas law that the existence of a contractual relationship bars the assertion of tort claims covering the same subject matter as that governed by the contract.[30] Under this rule, when the parties have entered into a contract, the courts do not entertain tort claims when the facts alleged are precisely the same as those alleged for a breach of contract claim.[31] In other words, a plaintiff may not "bring an action which arises out of the performance of a contract and

---

[29] *Ling v. Jan's Liquors*, 237 Kan. 629, 634, 703 P.2d 731, 735 (1985).

[30] *Ford Motor Credit Co. v. Suburban Ford*, 237 Kan. 195, 203-05, 699 P.2d 992, 998-99 (1985) (*quoting Isler v. Texas Oil & Gas Corp.*, 749 F.2d 22, 23-24 (10th Cir. 1984)).

[31] *Id*.

14

call it a tort action."[32]  On the other hand, the rule is not so broad as to bar tort claims

when the basic relationship between the parties is contractual.  For example, Kansas law

recognizes claims for legal and medical malpractice, even though there is a contract

between the lawyer and client and the physician and patient, as the case may be.  A

similar  principle of Colorado law, that tort claims are permitted only where the plaintiff

can establish a breach of a duty arising independently of any contract duties between the

parties, has been held not to preclude a negligence claim asserted against an underwriter

by a trustee under a bankruptcy plan.[33]

The Court holds that the Agreement does not precludes tort claims relating to

Underwriters' services to Brooke relating to the 2005 follow-on offering.  As discussed

above, the tort claims alleged in the Amended Complaint arise from actions distinct from

those addressed by the Agreement.

### C.  The tort claims are not subject to dismissal based upon expiration of the statute of limitations.

One of the grounds for dismissal urged by Underwriters is expiration of the statute

of limitations. The Court rejects this argument.

Under bankruptcy law, a trustee has a grace period of two years after the date of

filing of the bankruptcy petition to pursue claims existing on the date of filing.[34]  This

---

[32] *Beeson v. Erickson*, 22 Kan. App.2d 452, 456, 917 P.2d 901, 905 (1996).

[33] *Smith ex rel. Boston Chicken, Inc., v. Arthur Andersen, L.L.P.*, 175 F.Supp. 2d 1180, 1207 (D. Ariz. 2001).

[34] 11 U.S.C. § 105(a).

action was filed within two years of the date of Brooke's filings, October 28, 2008. The question is whether the claims would have been timely under state law if brought on the date of filing. Under Kansas law, the controlling statute of limitations for tort claims is K.S.A. 60-513(a)(4). It provides an "action for injury to the rights of another, not arising on contract, and not herein enumerated," shall be brought within two years.[35] But, when the "fact of injury is not reasonably ascertainable until some time after the initial act," the limitations period does not begin to run "until the fact of injury becomes reasonably ascertainable to the injured party."[36]

Underwriters argue that the fact of injury arising out of the 2005 public offering was reasonably ascertainable in August 2005, when the stock was sold, or at least by October 28, 2006. In support, they rely on the allegations of the Amended Complaint, contending that the Trustee has essentially admitted the fact of injury was ascertainable by such date in his allegations against Brooke Corp.'s directors for breach of fiduciary duty. Those allegations include, among other things, that the directors failed "to recognize the impropriety of the 2005 public offering"[37] and that they knew or should have known as early as February 2003 that Brooke was insolvent. The Trustee responds that Underwriters misconstrue his claim — that the alleged injury did not occur at the time of the 2005 public offering but occurred later when, because of the proceeds of the

---

[35] K.S.A. 60-513(a)(4).

[36] K.S.A. 60-513(b).

[37] Dkt. 103 at 19 (quoting Dkt. 67 at ¶ 292).

public offering, Brooke was able to prolong its corporate life and incur and take on additional debt.[38]  Further, it is argued that the fact of injury could not have been reasonably ascertained until Brooke's improper accounting practices were identified in 2008.

When the fact of injury becomes reasonably ascertainable is a question of fact. The Amended Complaint alleges that Brooke continued in business until 2008 based upon a false belief of solvency.  Under the Trustee's allegations, it is plausible that the fact of the injury alleged to have been caused by Underwriters' conduct relating to the 2005 stock offering was not reasonably ascertainable until after October 28, 2006.  The claims against Underwriters will not be dismissed based upon the statute of limitations defense.

**D.  The negligence claim fails to identify the duties which are alleged to have been breached.**

Under Kansas law, the existence of a duty owed by the defendant to the plaintiff is an essential element of a negligence claim.[39]  What duties, if any, Underwriters owed to Brooke under the circumstances of this case is not easily determined, as there is a dearth of case law addressing an underwriter's common law duties to an issuer.  The briefs of the parties reflect this problem, as neither presents a fully-developed argument supported by case law addressing underwriter liability under the common law.

Underwriters, as their  primary argument in support of dismissal of the negligence

---

[38] Dkt. 113 at 5 (citing Dkt. 67 at ¶¶ 369-71 and 377-379).

[39] *E.g., Roe v. Dept. of Social and Rehab. Servs.*, 278 Kan. 584, 592, 102 P.3d 396, 403 (2004).

17

claim, argue that as a matter of law an underwriter has no duty to an issuer. Underwriters cite two cases, neither of which the Court finds persuasive. The first is *In re Quintus Corporation*,[40] where the Chapter 11 trustee filed an adversary complaint against the debtor's lead underwriter for the debtor's initial public offering, alleging liability for causing the IPO shares to be underpriced. The uncontroverted facts established that the lead underwriter, because of a conflict of interest arising from its ownership of stock of the issuer, had retained an independent underwriter to recommend the maximum price of the offering, and this price was accepted by the issuer. The lead underwriter's motion for summary judgment on the negligence claim was granted. The court found that any such claim was barred because the trustee did not show a duty independent of the lead underwriter's contract with the issuer, and that the lead underwriter did not have a duty to set the maximum price. The case does not stand for the general proposition that as a matter of law, there is no extra-contractual duty owed by an underwriter to an issuer.

The second case is *HF Management*,[41] a case which does not even involve underwriter liability. In that case, an employer had brought an action against former employees and competitors alleging breach of non-solicitation agreements and unfair competition. The lower court disqualified the law firm representing the employer due to its work in connection with the competitor's initial public offering. The appellate court

---

[40] *Gwynne v. Credit Suisse First Boston (USA), Inc. (In re Quintus Corp.)*, 397 B.R. 710 (Bankr. D. Del. 2008).

[41] *HF Mgmt. Servs., LLC, v. Pistone*, 34 A.D.3d 82, 818 N.Y.S.2d 40 (N.Y. App. Div. 2006).

reversed. In doing so, it observed that "the creation of a fiduciary duty from underwriter's counsel to the issuer of securities makes no sense under the federal securities laws," and in support of that conclusion, agreed with the plaintiff's observation that "there is no conceivable basis for any conclusion that the due diligence is being performed for the issuer's benefit."[42] It is this last statement upon which Underwriters rely in this case. It is dicta used to support a ruling on an issue far removed from this case. This Court ascribes little weight to the statement.

In their reply brief, Underwriters cite four additional cases for the proposition that "other courts around the country join New York in confirming than an underwriter owes no duty of disclosure to any party other than investors."[43] But the cases are insufficient to convince the Court that Underwriters' position is correct, particularly under Kansas law.

The first case, *Enron Corporation*,[44] concerned a claim by institutional investors alleging the defendant bank fraudulently induced them to purchase certificates of beneficial ownership interests in an Enron special-purpose entity. Underwriters rely on the court's observation, when discussing a fraud claim, that the plaintiffs did not allege any relationship which would give rise to a duty to disclose, not that the law precludes

---

[42] *Id.*, 34 A.D.3d at 87, 818 N.Y.S.2d at 44.

[43] Dkt. 133 at 6.

[44] *In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, 761 F.Supp. 2d 504 (S.D. Tex. 2011).

19

such a duty.[45] Underwriters also cite a footnote from an earlier decision in the *Enron*[46]

litigation for the proposition that even where an underwriter has a duty of disclosure, the

duty extends only to purchasers. But that footnote was included in a ruling on a motion

for summary judgment in a case for securities fraud under § 10(b) of the 1934 Securities

Exchange Act. The Trustee's negligence claim is under the common law. Two of the

cases cited by Underwriters in their reply brief actually support the Trustee. *Union

County*[47] is a case by an issuer of bonds against underwriters, alleging state law claims.

Although the opinion includes the statement quoted by Underwriters, that "it is well-

accepted that underwriters generally owe no duty to the issuer of securities,"[48] the court

nevertheless denied the underwriter's motion for summary judgment. As to the breach of

fiduciary duty claim, the court found that the trier of fact could conclude that the

underwriter went "beyond the 'role' of underwriter and undert[ook] some additional duty

to the County."[49] Likewise, it held that a trier of fact could find a duty of disclosure

sufficient to support a negligence claim.[50] In the final case, *Certain Underwriters at*

---

[45] Id. at 556.

[46] *In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, 610 F.Supp. 2d 600, 626 n. 25 (S.D. Tex. 2009).

[47] *Union County v. Piper Jaffray & Co., Inc.*, 741 F.Supp. 2d 1064 (S.D. Iowa 2010).

[48] *Id.* at 1102.

[49] *Id*. at 1108.

[50] *Id*. at 1109.

*Lloyd's*,[51] although the court dismissed a counterclaim for negligence against certain underwriters because "the facts pled do not indicate that Underwriters owed [the counterclaim plaintiff] a duty of care," the dismissal was with leave to amend since it appeared that the counterclaim could be amended "to allege such facts, such as by adding allegations related to [the] parties' alleged oral agreement."[52]

The Trustee, when opposing the Motion, cites several cases for the proposition that "underwriters have a well-established duty to adequately investigate an issuer."[53] In the first case, *Smith ex rel. Boston Chicken v. Arthur Andersen*,[54] the court denied certain underwriters' motion to dismiss a negligence claim brought by a bankruptcy plan trustee, finding the complaint made a "*prima facia* showing that the Underwriter Defendants failed to meet . . . professional standards and the Company's reasonable expectations."[55] The second case, *Suprema Specialities*,[56] and the third case, *Citiline Holdings, Inc.*,[57] are not relevant since they concerned some underwriters' alleged liability under federal securities law.

---

[51] *Certain Underwriters at Lloyd's, London v. Real Estate Prof'ls Ins. Co.*, 2007 WL 4249078 (C.D. Cal. 2007).

[52] *Id.* at *10.

[53] Dkt. 113 at 7.

[54] 175 F.Supp. 2d 1180.

[55] *Id.* at 1207.

[56] *In re Suprema Specialities, Inc., Sec. Litig.*, 438 F.3d 256 (3rd Cir. 2006).

[57] *Citiline Holdings, Inc., v. iStar Fin., Inc.*, 701 F.Supp. 2d 506 (S.D.N.Y. 2010).

21

The Trustee also relies on the general principle of Kansas tort law that a duty can arise from circumstances which require one to exercise a certain degree of care to prevent a foreseeable injury to another.[58] He argues that Underwriters had a duty to exercise reasonable care because Brooke was a foreseeable plaintiff, the probability of harm was foreseeable, and there is no public policy against imposing a duty on Underwriters.[59] Of necessity, these general principles are very broad and fluid. There is no Kansas case law applying them to underwriters of stock offerings. Neither of the parties have cited any Kansas cases which are alleged to have arisen in circumstances analogous to this case where a duty was either found to exist or to be absent.

Based upon the foregoing, the Court declines to rule as a matter of law at this early stage of the litigation that under Kansas law, Underwriters owed no duty to Brooke. Some courts have found underwriters to have common law duties, and the Court is not convinced that the Kansas Supreme Court would rule otherwise.

However, the Amended Complaint fails to define the duty or duties alleged to have been breached. For purposes of their respective arguments, both parties have construed the Amended Complaint and stated in their briefs the duties they understand to be in issue. For example, the Trustee argues that "the Underwriters had a duty to adequately investigate Brooke, to discover Brooke's improper financial accounting practices and

---

[58] Dkt. 113 at 10 (citing *Durflinger v. Artiles*, 234 Kan. 484, 488, 673 P.2d 86, 91-92 (1983) and other cases).

[59] *Id.* at 11 (citing *Berry v. Nat'l Med. Serv., Inc.*, 41 Kan. App.2d 612, 616-17, 205 P.3d 745, 749-50 (2009)).

22

insolvency, to disclose these issues to Brooke directors, and to ensure that the 2005

Offering materials adequately and accurately disclosed Brooke's improper financial

accounting practices and insolvency."[60] But there are no express allegations of such

duties in the Amended Complaint. The word "duty" is not used in the Amended

Complaint in relation to Underwriters. The Trustee's brief places reliance upon general

principles of Kansas negligence law imposing a duty of reasonable care to protect others

from foreseeable harm. But at oral argument on the Motion, counsel for the Trustee

emphasized the law of professional negligence. Neither the Court nor Underwriters can

identify with certainty the duty or duties which the Trustee alleges have been breached.

Since the existence of a duty is an essential element of a negligence claim, Count

XIV of the Amended Complaint is subject to dismissal for failure to state a claim on

which relief can be granted.

### E. The Court finds Count XIII of the Amended Complaint, deepening insolvency, does not state a claim on which relief can be granted, but predicts that the Kansas Supreme Court would accept deepening insolvency as a theory of harm.

A commentator describes the theory of deepening insolvency as positing "that the

defendant — typically the board, a lender, an auditor, or someone else with a 'deep

pocket' — should have taken action to liquidate or wind down the company and did not;

as a result the company was less valuable at the time it ultimately was shut down, leaving

less money available to distribute to creditors than the company would have provided

---

[60] *Id*. at 9-10.

Case 10-06246   Doc# 224   Filed 02/02/12   Page 23 of 38

earlier."[61]  Underwriters make a two-pronged attack upon deepening insolvency, arguing

that it is neither a valid cause of action, nor a rational theory of corporate harm.

Much has been written in cases and commentary on the subject of deepening

insolvency, and positions are far from consistent.  In 2005, one bankruptcy court

described the situation as follows:

> [T]he emerging theory of "deepening insolvency" has not
> been uniformly applied nor universally embraced.  *See*, Sabin
> Willet, *The Shallows of Deepening Insolvency*, 60 Bus. Law.
> 549 (Feb.2005); Jo Ann J. Brighton, *Deepening Insolvency*,
> 23–3 Am. Bankr. Inst. J. 34 (Apr.2004).  Some courts have
> recognized "deepening insolvency" as an independent tort.
> *See, e.g., Official Committee of Unsecured Creditors v. R.F.
> Lafferty & Co., Inc.*, 267 F.3d 340 (3d Cir.2001); *In re
> Del–Met Corp.*, 322 B.R. 781 (Bankr. M.D. Tenn.2005); *In re
> Exide Technologies, Inc.*, 299 B.R. 732 (Bankr. D. Del. 2003).
> Concluding that "deepening insolvency" constituted a valid
> cause of action under Pennsylvania law, the court in *Lafferty*
> characterized the essence of the action as the "fraudulent
> expansion of corporate debt and prolongation of corporate
> life."  Other courts have viewed "deepening insolvency" as a
> measure of damages, not as an independent cause of action.
> *Schacht v. Brown*, 711 F.2d 1343 (7th Cir.1983); *In re Global
> Service Group, LLC*, 316 B.R. 451 (Bankr. S.D.N.Y. 2004).
> The theory of "deepening insolvency" has also been rejected
> outright.  *Bondi v. Citigroup, Inc.*, 2005 WL 975856 (N.J.
> Super. L. 2005).[62]

Although some deepening insolvency cases fail to distinguish between deepening

---

[61] Russell C. Silberglied, *Don't Throw Away Your Deepening Insolvency Materials Just Yet*, 2009
Norton Ann. Survey of Bankr. Law 7, __ (2009), available on Westlaw at 2009 NRTN-ASBL 7 (quoted
text appears at p. 2 in downloaded pdf file).

[62] *Rafool v. Goldfarb Corp. (In re Fleming Packaging Corp.),* 2005 WL 2205703, *7 (Bankr.
C.D. Ill. 2005).

Case 10-06246    Doc# 224    Filed 02/02/12    Page 24 of 38

insolvency as an independent cause of action and as a theory of harm for a separate tort, the arguments in this case require the Court to separately consider these related issues.

### 1. The Court predicts that the Kansas Supreme Court would reject deepening insolvency as an independent cause of action under the circumstances alleged by the Trustee.

When opposing Underwriters' Motion, the Trustee urges[63] this Court to find deepening insolvency to be an independent tort under Kansas law based upon the reasoning of *Lafferty*,[64] a 2001 Third Circuit opinion often identified as a leading appellate decision recognizing deepening insolvency as an independent tort. It defined deepening insolvency as "an injury to the Debtors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life,"[65] and predicted that Pennsylvania tort law would provide a remedy by recognizing a cause of action.[66] *Lafferty* has been followed by some courts[67] and rejected by others.[68] The case law addressing deepening insolvency is voluminous.[69] One commentator observes that

---

[63] Dkt. 113 at 18-24.

[64] *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3rd Cir. 2001).

[65] *Id*. at 347.

[66] *Id*. at 351.

[67] *E.g., Smith v. Arthur Andersen LLP (In re Boston Chicken, Inc.)*, 421 F.3d 989, 1003-04 (9th Cir. 2005.)

[68] *E.g., Alberts v. Tuft (In re Greater Southeast Cmty. Hosp. Corp., I)*, 333 B.R. 506, 516-17 (Bankr. D.D.C. 2005).

[69] *See* Tracy Bateman Farrell, *"Deepening Insolvency" as Cause of Action in Tort*, 23 A.L.R. 6th 457 (2007).

25

"[u]ntil 2006, deepening insolvency was gaining 'growing acceptance' in bankruptcy courts. However, more recently, federal courts have scaled back deepening insolvency claims and damages assertions."[70]

There are no decisions by the Kansas appellate courts or the Tenth Circuit addressing the question of whether the tort is recognized under Kansas law. The task before this Court is therefore to predict what the Kansas Supreme Court would hold if presented with the question in this case.

"Kansas courts have a long history . . . of looking to the decisions of the Delaware courts involving corporation law, as the Kansas Corporation Code was modeled after the Delaware Code."[71] This reliance on Delaware law includes matters relating to the obligations of corporate directors.[72] The decision of the Delaware Chancery Court in *Trenwick*,[73] which held that under Delaware law there is no independent tort of deepening insolvency, is therefore very persuasive in predicting Kansas law.

In *Trenwick*,[74] the court granted a company's former corporate directors' motion to dismiss a claim of deepening insolvency. The plaintiff was a litigation trust which had

---

[70] Silberglied, 2009 Norton Ann. Survey of Bankr. Law at ___, available on Westlaw at 2009 NRTN-ASBL 7 (quoted text appears at p. 2 in downloaded pdf file).

[71] *Arnaud v. Stockgrowers State Bank*, 268 Kan. 163, 165, 992 P.2d 216, 218 (1999).

[72] *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 77 P.23d 130 (2003).

[73] *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006), *aff'd by unpub. op. adopting lower court's reasoning, sub nom. Trenwick Am. Litig. Trust v.Billet*, 931 A.2d 438 (Del. 2007).

[74] *Id.* at 204-06.

been formed in reorganization of a subsidiary of an insurance holding company. The trust brought an action against former directors of the holding company on various claims, including deepening insolvency. The trust alleged that the defendants fraudulently concealed the true nature and extent of the company's financial problems by expanding the amount of debt undertaken; that the directors knew the company would not be able to pay the increased debt, but fraudulently represented to creditors and other outsiders that the debt would be repaid; that the life of the corporation was prolonged and its insolvency increased; and that as a result, the corporation suffered damages. The Court, in a well-reasoned opinion, found the concept of deepening insolvency empty. It began its analysis by observing that, "Delaware law imposes no absolute obligation on the board of a company that is unable to pay its bills to cease operations and to liquidate. Even when the company is insolvent, the board may pursue, in good faith, strategies to maximize the value of the firm."[75] If the board does so, "it does not become the guarantor of that strategy's success."[76] If continued insolvency or increased insolvency results, this alone does not give rise to a cause of action, because the directors are protected by the business judgment rule.[77] However, the court also stated that rejection of an independent tort cause of action for deepening insolvency does not absolve directors of insolvent corporations of responsibility.

---

[75] *Id*. at 204.

[76] *Id*. at 205.

[77] *Id*.

27

Rather, it remits plaintiffs to the contents of their traditional toolkit, which contains, among other things, causes of action for breach of fiduciary duty and for fraud. The contours of these causes of action have been carefully shaped by generations of experience, in order to balance the societal interests in protecting investors and creditors against exploitation by directors and in providing directors with sufficient insulation so that they can seek to create wealth through the good faith pursuit of business strategies that involve a risk of failure. If a plaintiff cannot state a claim that the directors of an insolvent corporation acted disloyally or without due care in implementing a business strategy, it may not cure that deficiency simply by alleging that the corporation became more insolvent as a result of the failed strategy.[78]

This Court finds the reasoning of *Trenwick* to be sound, and predicts with confidence that the Kansas Supreme Court would follow *Trenwick* if the motion to dismiss the deepening insolvency claim had been filed by the former directors of Brooke Corp., against whom the Trustee also asserts a claim for deepening insolvency in this adversary proceeding. The question is whether the Kansas Court would extend that position to a deepening insolvency claim against Underwriters, who were retained by Brooke Corp.

The Court concludes that it would and predicts that Kansas would not recognize deepening insolvency as an independent tort when it is asserted against Underwriters, rather than the former directors. Although in contrast to the law applicable to the obligations of directors, there is no well-developed law concerning the duties of

---

[78] *Id.*

underwriters to an issuing corporation, the general principles of tort law are up to the task fulfilled by the well-developed Delaware law concerning the duties of directors. Kansas tort law can balance the "societal interests" of protecting creditors against exploitation by underwriters and provide underwriters with sufficient insulation so they can in good faith pursue the objectives of the corporation in making public offerings pursuant to business strategies. If directors of Brooke as a matter of law are not liable for a separate tort of deepening insolvency, the underwriters involved in precisely the same transactions should be similarly situated. If the Trustee cannot state a claim against Underwriters for negligence, fraud, or some other recognized tort, that deficiency cannot be cured by alleging the result of Underwriters' conduct was deepening insolvency. Count XIII is therefore dismissed for failure to state a claim on which relief can be granted.[79]

### 2. The Court predicts that the Kansas Supreme Court would accept deepening insolvency as a theory of harm.

In addition to arguing that Count XIII, deepening insolvency, should be dismissed, Underwriters also attack deepening insolvency as a valid theory of harm. The Court

---

[79] Even if the tort as defined by *Lafferty* were recognized in Kansas as urged by the Trustee, Count XIII would be subject to dismissal. Although *Lafferty* defines the tort as "injury to corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life," Count XIII fails to allege sufficient facts to establish the elements of the tort. There is no allegation that Underwriters' conduct was fraudulent or similarly wrongful. Count XIII does not even include an allegation of negligence. Although one could possibly infer negligence from the allegations of Count XIII, the Trustee has not argued that negligence is sufficient under *Lafferty*, and the Third Circuit, which decided *Lafferty*, has rejected negligence as a basis for a claim of deepening insolvency. *In re CitX Corp., Inc.*, 448 F.3d 672 (3rd Cir. 2006). The Court has not located any cases recognizing the tort of deepening insolvency based upon negligence, in contrast to fraudulent or other intentional conduct. The Trustee seems to believe that prolonging the life of an insolvent corporation, which results in deepening the insolvency, states a claim for relief for relief under the tort of deepening insolvency. This is not what *Lafferty* and its progeny hold. Deepening insolvency is not a strict liability tort.

29

understands "theory of harm" to refer to an injury, and that a valid theory of harm refers to an injury for which the law recognizes a right to compensation, however measured.[80] This basis for recovery of damages is alleged both in the negligence claim, Count XIV, and the deepening insolvency claim, Count XIII.  Although the issue as to the validity of this theory of harm would appear to be moot since the Court has held that neither count states a claim on which relief can be granted, the Court addresses this issue since it may be relevant to the Trustee's decision whether to file a second amended complaint and, if he does so, to the allegations he will include.

For the following reasons, the Court declines to rule that the Kansas Supreme Court would reject deepening insolvency as a theory of corporate harm.  The Delaware Chancery Court, when rejecting deepening insolvency as a stand-alone tort, did not consider whether deepening insolvency should be recognized as a theory of corporate harm or a measure of damages.  This Court therefore looks to the developing case law and commentary addressing this issue.

The Third Circuit, when recognizing the tort of deepening insolvency in its *Lafferty* decision, described the injury to be redressed by the tort of deepening insolvency as follows:

> Under federal bankruptcy law, insolvency is a financial
> condition in which a corporation's debts exceed the fair

---

[80] Some reported decisions fail to distinguish between a theory of harm and a measure of damages, but these are separate concepts.  Damages, one form of a remedy, are awarded as compensation for the harm.  Measure of damages is "[t]he basis for calculating damages to be awarded to someone who has suffered an injury."  Black's Law Dictionary (9th ed. 2009).

Case 10-06246    Doc# 224    Filed 02/02/12    Page 30 of 38

market value of its assets. [Citation omitted.] Even when a corporation is insolvent, its corporate property may have value. The fraudulent and concealed incurrence of debt can damage that value in several ways. For example, to the extent that bankruptcy is not already a certainty, the incurrence of debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs on the corporation. [Citation omitted.] . . . Aside from causing actual bankruptcy, deepening insolvency can undermine a corporation's relationships with its customers, suppliers, and employees. The very threat of bankruptcy, brought about through fraudulent debt, can shake the confidence of parties dealing with the corporation, calling into question its ability to perform, thereby damaging the corporation's assets, the value of which often depends on the performance of other parties. [Citation omitted.] In addition, prolonging an insolvent corporation's life through bad debt may simply cause the dissipation of corporate assets.

These harms can be averted, and the value within an insolvent corporation salvaged, if the corporation is dissolved in a timely manner, rather than kept afloat with spurious debt.[81]

A leading case on deepening insolvency as a theory of harm is the Seventh Circuit's *Schacht*[82] decision. The liquidator of an insurance company brought suit against officers, directors, and a parent corporation who allegedly continued the insurer in business past the point of insolvency and looted the insurer of its most profitable and least risky business. The court rejected the argument that there is a "general rule prohibiting a corporation from suing for damages caused by the artificial prolongation of its life."[83]

---

[81] *Lafferty*, 267 F.3d at 349-350.

[82] *Schacht v. Brown*, 711 F.2d 1343 (7th Cir. 1983).

[83] *Id.* at 1350.

The argument was found contrary to the common sense notion that a corporation is inevitably "damaged by the deepening of its insolvency, through increased exposure to creditor liability."[84]

Deepening insolvency as a theory of harm was thoughtfully examined by the bankruptcy court in *Greater Southeast Community Hospital*.[85] The trustee of a liquidating trust under the debtor's Chapter 11 plan sued the debtor's former officers and directors alleging breach of their fiduciary duties by misusing corporate assets and by allowing the debtor to undertake additional debt in a fiscally irresponsible manner. The court found deepening insolvency to be a theory of harm, not a separate tort, and held that it applies whether the injury occurred as a result of negligence or fraud.[86] As to the measure of damages, the court observed the trustee "will need to prove that [the debtor] and its subsidiary corporations were actually harmed by the defendants' allegedly excessive borrowing habits, and then quantify that harm. The damages arising from these injuries (if proven) may be larger or smaller than the amount of excess debt acquired by the debtors, but they will almost certainly not be the same."[87]

Recovery of damages for a claim of deepening insolvency caused by negligence

---

[84] *Id.*

[85] *Greater Southeast Cmty. Hosp. Corp. I*, 353 B.R. 324.

[86] *Id.* at 338.

[87] *Id.*

was at issue before the Third Circuit in *Chait*,[88] a 2008 opinion.  The insurance

commissioner for the State of Vermont sued an accounting firm on behalf of a defunct

insurance company.  The allegations were that the accountants negligently issued audit

opinions that materially understated the company's loss reserves, that but for the audits,

the company would not have continued to write new insurance policies, and that because

of the inaccurate audits, the commissioner acted too late.  A jury found in favor of the

commissioner.  On appeal, the accountant-auditors argued deepening insolvency cannot

be used as a measure of damages for an independent cause of action such as malpractice,

citing *Lafferty* and *CitX*.[89]  The court rejected this argument, finding "a trend among [New

Jersey's state] courts toward recognizing 'deepening insolvency' damages,"[90] and holding

under New Jersey law that "[w]hen a plaintiff brings an action for professional negligence

and proves that the defendant's negligent conduct was the proximate cause of a

corporation's increased liabilities, decreased fair market value, or lost profits, the plaintiff

may recover damages in accordance with state law."[91]

　　　　The Court recognizes that there are also courts[92] that have rejected deepening

---

[88] *Thabault v. Chait*, 541 F.3d 512 (3rd Cir. 2008).

[89] *Id*. at 518 and 520.

[90] *Id*. at 521.

[91] *Id*. at 520.

[92] *E.g., Official Committee of Unsecured Creditors v. BNP Paribas (In re Propex Inc.),* 415 B.R. 321, 331 (Bankr. E.D. Tenn. 2009) (rejecting deepening insolvency both as a separate tort and as a "measure of damages" under Tennessee law, stating, "[s]ince damages under Tennessee law are already available for fraud and breach of fiduciary duty and, since those damages are, after all, designed to

insolvency as a theory of harm, and commentators have questioned its soundness.[93]

However, as one commentator has noted, perhaps "the present debate about 'deepening insolvency' as a damages model is more one about labeling than substance."[94] The Court agrees. A theory of harm (or a damage model) is different from a measure of damages. The well-reasoned cases allowing the damage model do not define the damages in terms of a comparison of balance sheets before and after the alleged wrongful act. They require proof of specific itemized damages, such as increased liabilities and lost profits, proximately caused by a breach of a legally recognized duty.[95] "The fact that . . . damages . . . may be labeled deepening insolvency damages does not change the fact that they can be classic damages too; despite the similarity, the difference is in the proof: not just a comparison of balance sheets, but proof of specific, actual, itemized damages proximately caused by the wrongdoing."[96]

---

provide full compensation for injuries suffered, it must be asked what the Tennessee courts would have to gain by recognizing deepening insolvency as a new tort or as a measure of damages heretofore overlooked in the long march of corporate jurisprudence.").

[93] Sabin Willett, *The Shallows of Deepening Insolvency*, 60 Bus. Law. 549 (2005) (arguing that extending credit does not deepen insolvency).

[94] Silberglied, 2009 Norton Ann. Survey of Bankr. Law at ___, available on Westlaw at 2009 NRTN-ASBL 7 (quoted text appears at p. 9 in downloaded pdf file).

[95] *See Kittay v. Atlantic Bank (In re Global Serv. Group, LLC)*, 316 B.R. 451, 458 (Bankr. S.D.N.Y. 2004) ("[p]rolonging an insolvent corporation's life, without more, will not result in liability under either [deepening insolvency as an independent tort or deepening insolvency as a damage theory]. Instead, one seeking to recover for 'deepening insolvency' must show that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt.").

[96] Silberglied, 2009 Norton Ann. Survey of Bankr. Law at ___, available on Westlaw at 2009 NRTN-ASBL 7 (quoted text appears at p. 8 in downloaded pdf file).

34

In Kansas, "[t]he purpose of the tort law is to make an injured party whole."[97] "'One who commits a tortious act is liable for the injury and loss that are the natural and probable result of his wrongful act.'"[98]  The Court can identify no principle of Kansas law which would prohibit as a matter of law the recovery of damages sustained as a result of the wrongful prolongation of corporate existence and predicts the Kansas Supreme Court would allow such recovery.

Further, this issue is before the Court on a motion to dismiss.  The Trustee has not had an opportunity to develop his theory of injury and resulting damages.  Assuming the elements of tort liability under Kansas law are established, the damages claimed by the Trustee may redress the harm suffered by Brooke because of the wrongful prolongation of its operations.

**F.  The defense of *in pari delicto* does not provide a basis to dismiss the Trustee's claims against Underwriters.**

As an alternative argument in support of their motion to dismiss, Underwriters rely upon the defense of *in pari delicto*.  This "common-law defense . . . prohibits a party from recovering damages arising from misconduct for which the party bears responsibility, bears fault, or which resulted from his or her wrongdoing."[99]  When, as in this case, a

---

[97] *Hayes Sight & Sound, Inc., v. ONEOK, Inc.*, 281 Kan. 1287, 1306, 136 P. 3d 428, 442 (2006).

[98] *Ettus v. Orkin Exterminating Co., Inc.*, 233 Kan. 555, 562, 665 P.2d 730, 737 (1983) (*quoting Foster v. Humburg*, 180 Kan. 64, Syl.  ¶ 5, 299 P.2d 46, 48 (1956)).

[99] 27A Am. Jur. 2d, Equity § 103, available on Westlaw at AMJUR EQUITY § 103 (database updated November 2011).

Case 10-06246   Doc# 224   Filed 02/02/12   Page 35 of 38

bankruptcy trustee is enforcing causes of action belonging to the debtor, "the trustee . . . stand[s] in the shoes of the debtor and 'take[s] no greater rights than the debtor himself had'"[100] as of the date the bankruptcy petition was filed. This means that if the defense of *in pari delicto* would have barred a claim brought by Brooke on the date of filing, it also bars the Trustee's claims. Since the claims alleged arise under Kansas law, the Court looks to Kansas law when considering Underwriters' position that *in pari delicto* bars the claims against Underwriters.[101]

Kansas has recognized the principle of *in pari delicto,* which requires a weighing of the wrongful act of each party.[102] But since the Court has held that Kansas would not recognize the tort of deepening insolvency, it is not necessary to address whether the defense would apply to that cause of action.

There is no doubt that *in pari delicto* does not bar a negligence claim against Underwriters. Under Kansas negligence law, comparative fault, not *in pari delicto*,

---

[100] *Sender v. Buchanan ( In re Hedged-Investments Assocs., Inc.)*, 84 F.3d 1281, 1285 (10th Cir. 1996) (*quoting* H.R. Rep. No. 595, 95th Cong., 1st Sess. 368, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6323, *and citing* 11 U.S.C. § 541).

[101] *Lafferty*, 267 F.3d at 361 (Cowen, J., dissenting: "Like the majority, I agree that in evaluating the affirmative defense at issue here — the *in pari delicto* doctrine — we apply state law for the plaintiffs' state causes of action.").

[102] *Goben v. Barry*, 234 Kan. 721, 727, 676 P.2d 90, 97 (1984) states as follows:

> [*In pari delicto*] requires when "the wrong of the one party equals that of the other, the defendant is in the stronger position." 27 Am. Jur. 2d, Equity § 141, p. 676. This requires the court to weigh the wrongful acts of each party. The purpose is to avoid allowing an overwhelmingly offensive act of the defendant to stand merely because the plaintiff's conduct was also wrongful, although slight.

36

addresses the issue of liability when the plaintiff as well as the defendant or defendants are alleged to be at fault.  This doctrine, codified at K.S.A. 2010 Supp. 60-258a(a), is as follows: "The contributory negligence of a party . . . does not bar that party . . . from recovering damages for negligence resulting in . . .  property damage or economic loss, if that party's negligence was less than the causal negligence of the party or parties against whom a claim is made, but the award of damages to that party must be reduced in proportion to the amount of negligence attributed to that party."  Under the law of comparative negligence, the allocation of each party's proportionate negligence is a question of fact.[103]

For the foregoing reasons, the Court rejects Underwriters' argument that *in pari delicto* provides an alternative basis to dismiss the claims against them.

### G.  The Trustee is granted leave to file an amended complaint consistent with this opinion.

For the above reasons, the Court has found that the Amended Complaint fails to state claims against Underwriters on which relief can be granted.  However, since the Court has determined that a negligence claim against Underwriters may be recognized under Kansas law, the Court grants the Trustee leave to file an amended negligence claim against Underwriters, if he so wishes.  Any such amended complaint shall be due on or before 28 days after the entry of this order.

**CONCLUSION.**

---

[103] *Scales v. St. Louis-San Francisco Ry. Co.*, 2 Kan. App.2d 491, 498, 582 P.2d 300, 306 (1978).

37

The Amended Complaint fails to state claims against Underwriters on which relief can be granted. If a second amended complaint against Underwriters is not filed within 28 days of the entry of this order, the claims against Underwriters will be dismissed with prejudice.

**IT IS SO ORDERED.**

# # #